**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

DONNA L. FRAIN,                    )
                                   )
            Plaintiff,             )
                                   )        CAUSE NO. 1:13-CV-177 PS
      v.                           )
                                   )
COMMISSIONER OF SOCIAL SECURITY,   )
                                   )
            Defendant.             )

## OPINION AND ORDER

Plaintiff Donna L. Frain appeals the Social Security Administration's

determination that she is not disabled.  In essence, she argues that the ALJ erred in

granting the most weight to the opinions of two state agency psychologists, as opposed

to a consulting psychologist or her counselor.  She also argues that the ALJ erred in

discounting her credibility.  Because I find that the ALJ relied on substantial evidence in

making each of these findings, I **AFFIRM** his decision.

## BACKGROUND

Readers looking for a more extensive discussion of Frain's medical record are

directed to the detailed summaries in the ALJ's decision (R. at 23-30)[1] and in Frain's

opening brief (DE 24).  Rather than simply reiterating those summaries, I will give a

brief overview of the history of Frain's health issues and proceedings before the Social

Security Administration.

---

[1] Citations to the record will be indicated as "R. ___."

**Frain's Health**

Although Frain alleged both mental and physical impairments before the ALJ, she challenges only the portion of the decision relating to her mental impairments. Frain claims she has been disabled by post-traumatic stress disorder (PTSD), depression, agoraphobia, and anxiety. (DE 24 at 2) In 2004, Frain was hospitalized for several weeks after attempting suicide.[2] (R. 563) At the time, she was working as a church janitor, but her nervous breakdown left her unable to work. (*Id*. at 48) She was awarded Social Security disability benefits at that time. (*Id*. at 47) She forfeited those benefits, however, when she was incarcerated from 2009 to 2011 for dealing methamphetamine. (*Id*.; *Id*. at 26) During her incarceration, Frain showed no signs of mental difficulties upon her intake examination in 2009, nor during multiple examinations by prison doctors. (*Id*. at 27; *see also e.g. Id*. at 483, 489, 502) While incarcerated, Frain was able to complete her GED. (R. 46)

Upon her release from prison, Frain reapplied for benefits and met with Dr. Candace Martin, Psy.D., in July 2011 for a consultative mental status examination as part of her social security disability application. (*Id*. at 516) It was the only time she would see Dr. Martin. Dr. Martin found that Frain was exceptionally anxious, depressed, and distraught; reported confusion, poor concentration, and distractability;

---

[2] There are conflicting reports throughout the record as to whether this occurred in 2003 or 2004. The admission records from the hospital indicate an admission date of June 16, 2004 (R. 563), so that is the date I'll rely on.

and displayed nervous shaking, restlessness, and crying during the interview. (*Id.* at 518) Frain reported, however, that she tried to present herself in a way that would make others think she's functioning well, such as helping with the vacuuming, laundry, cooking and maintaining her hygiene and grooming appropriately. (*Id.* at 518, 520) Dr. Martin observed that Frain was well-oriented to time, place, and person; maintained eye contact adequately; and had adequate attention and concentration during the consultation. (*Id.* at 518)

Dr. Martin diagnosed Frain with PTSD, major depressive disorder, generalized anxiety disorder, panic disorder, psychotic disorder NOS, methamphetamine dependence in remission, sleep terrors, amnestic disorder NOS, learning disorder NOS, personality disorder NOS, and probable borderline intellectual functioning. (*Id.* at 520-21) She assessed a GAF (Global Assessment of Functioning) score of 18. (*Id.* at 520) GAF scores reflect a clinician's judgment about the individual's overall level of functioning. The higher the GAF score, the better the individual's psychological, social, and occupational functioning. A GAF of 18 is alarmingly low; it reflects very serious symptoms indicating "some danger of hurting self or others (*e.g.* suicide attempts without clear expectation of death; frequently violent; manic excitement), or occasionally fails to maintain minimal personal hygiene (*e.g.* smears feces), or gross impairment in communication (*e.g.* largely incoherent or mute)." *See* Am. Psychiatric Assoc., Diagnostic & Statistical Manual of Mental Disorders 32 (4th ed., Text Rev. 2000).

Dr. Martin concluded that Frain was "not likely going to prove to be a reliable or good employee until she is better stabilized medically." (R. 520)

Later in July 2011 and again in October 2011, state agency psychologists Dr. Amy S. Johnson, Ph.D., and Dr. Maura B. Clark, Ph.D., reviewed the evidence in the record, including Dr. Martin's assessment, and provided a Mental Residual Functional Capacity Assessment. They found that Dr. Martin's assessment was extreme and afforded it no weight. (*Id*. at 525, 588[3]) The state agency psychologists found Dr. Martin's findings inconsistent with Frain's daily activities and the fact that she demonstrated an intact memory, normal concentration, and normal social interaction during the exam. (*Id*. at 526, 588) They found it significant that Frain had demonstrated no symptoms while in prison, because if her symptoms had been as severe as she reported to Dr. Martin, she would not have been able to mask them and would have displayed some symptoms while in prison. (*Id*.) They further found that a sudden onset of severe symptoms after her release from prison was highly unlikely. (*Id*.) For these reasons, they discounted Frain's credibility. (*Id*.) They ultimately concluded that Frain could understand, remember, and carry out at least unskilled tasks, could relate on at least a superficial and ongoing basis with coworkers and supervisors, could attend to task for sufficient periods of time to complete tasks, and could manage the stresses involved with at least unskilled work. (*Id*.)

---

[3] It should be noted that Dr. Clark did not address the various issues discussed below individually, but did review and affirm Dr. Johnson's findings as a whole.

During the time period between the two state agency reviews, in August 2011, Frain began treatment at the Bowen Center. She was referred there by her probation officer for relapse prevention in connection with her previous dependence on methamphetamine. (R. 543) She began individual and group therapy sessions with Jennifer Dyarman, LSW. Frain attended treatment at the Bowen Center about every two weeks for about a year (*see generally d*. at 615-663), and it is unclear from the records whether she continued treatment beyond that; the records end in August 2012 (*Id*. at 661).

When Frain first began treatment in August 2011, she reported that she was happy, but anxious, and the intake examiner found her to be relaxed and cooperative, with a clean and neat appearance. (*Id*. at 543) She was diagnosed with an anxiety disorder with a guarded prognosis. (*Id*. at 545-46) In September 2011, when she began treatment with Jennifer Dyarman, Frain was in acute distress with a depressed affect, but she was relaxed and stable. (*Id*. at 641) From October 2011 through December 2011, although she experienced some ups and downs, Frain's overall state improved somewhat to moderate distress, an appropriate (not "depressed") affect, and again, she was relaxed and stable. (*Id*. at 636-40)

Starting at the end of January 2012, despite reporting more stress, Ms. Dyarman found that Frain's condition improved again to mild distress, appropriate affect, and still relaxed and stable. (*Id*. at 630) This is somewhat in tension with the reports of a nurse practitioner who met with Frain that same day, just prior to Ms. Dyarman's

meeting.  During the meeting with the nurse practitioner, Frain reported increased

depressive symptoms, nightmares, excessive worry, and flashbacks.  (*Id*. at 624)  In

response, the nurse practitioner prescribed medications to Frain to "improve

symptoms."  (*Id*. at 627-28)  It appears this is the first time since her release from prison

that Frain had taken psychological medications.  During this visit, the nurse practitioner

also assigned a GAF score of 30-40 (*id*. at 627), which indicates serious symptoms.

It appears that the medications helped because during the time period from

February 2012 through August 2012, treatment notes indicate Frain was smiling more,

was more relaxed, was displaying a greater range of affect, and that her medication was

helping.  (*Id*. at 615-30, 651-63)  That is not to say that she was symptom-free, for she

also reported at various times struggling with insomnia, bedwetting, and nightmares.

(*Id*.)  She also reported some continued difficulty with anxiety and depression.  (*Id*.)

Ms. Dyarman submitted a letter on Frain's behalf on June 25, 2012, stating that

although Frain had experienced some stabilization of symptoms with medication, she

would not be able to maintain employment due to the severity of her symptoms.  (*Id*. at

642)  Ms. Dyarman reported that Frain would be off task 25 percent or more of the

workday, was markedly limited in her activities of daily living, was markedly or

extremely limited in a handful of work areas such as concentration/attention, ability to

work with or interact with others, and ability to complete a normal workday without

interruption.  (*Id*. at 645-46)  She stated that Frain would need an unknown number of

unscheduled breaks throughout the workday and would be absent more than four days a week. (*Id*. at 647) She stated that Frain's GAF score at this point was 46. (*Id*. at 43)

**Social Security Administration Proceedings**

Frain applied for disability insurance benefits on June 27, 2011, alleging a disability onset date of June 15, 2004. (R. 21) She was denied on both consideration and reconsideration. (*Id*.) After a hearing before an ALJ in which Frain testified, the ALJ issued a decision denying benefits. (*Id*. at 18-38) The ALJ employed the standard five-step analysis. (*Id*.) At step one, the ALJ confirmed that Frain had not engaged in substantial gainful activity since her application date. (*Id*. at 23) At step two, the ALJ found Frain suffered severe impairments of amnestic disorder, depression, and anxiety/panic disorder/post-traumatic stress disorder. (*Id*.) At step three the ALJ found that Frain's conditions did not satisfy any listed impairment. (*Id*. at 24) At step four, in analyzing Frain's residual functional capacity, the ALJ found that Frain could:

> perform a full range of work at all exertional levels, but with the following nonexertional limitations: She cannot understand, remember, or carry out detailed or complex job instructions, but she can perform simple, repetitive tasks on a sustained basis (meaning eight hours a day/five days a week, or an equivalent work schedule). She retains the ability to maintain attention and concentration to perform simple, one- or two-step tasks for two hours at a time without requiring redirection to task. She cannot have sudden or unpredictable workplace changes. She must have work at a flexible pace (where the employee is allowed some independence in determining either the timing of different work activities or pace of work). Socially, she can have only casual/superficial interactions with others, including supervisors, coworkers, and the general public. She is best suited to working alone, in semi-isolation from others, or as part of a small group.

(*Id*. at 25)  At step five, the ALJ found Frain could not perform past relevant work but there were a sufficiently significant number of jobs in the national economy she could perform.  (*Id*. at 30-31)

The Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner.  (DE 24 at 2)  Frain timely sought review of that decision by filing this case.  Frain's arguments on appeal are that the ALJ improperly evaluated the opinions of Dr. Martin, Ms. Dyarman, and the state agency psychologists, and also improperly evaluated Frain's credibility regarding the severity of her symptoms.

## DISCUSSION

If an ALJ's findings of fact are supported by "substantial evidence" then they must be sustained. *See* 42 U.S.C. § 405(g).  Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Nelms v. Astrue*, 553 F.3d 1093, 1097 (7th Cir. 2009) (*quoting Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  Review of the ALJ's findings is deferential.  *Overman v. Astrue*, 546 F.3d 456, 462 (7th Cir. 2008).  In making a substantial evidence determination, I must review the record as a whole, but I can't re-weigh the evidence or substitute my judgment for that of the ALJ. *Id*.

### Dr. Candace Martin, Psy.D.

Frain claims the ALJ failed to properly weigh Dr. Martin's opinion because he did not use the correct checklist of factors in weighing her opinion and his reasons for discounting her opinion were not supported by substantial evidence.  Specifically, the

ALJ found that Dr. Martin's opinion was inconsistent with the record and unsupported because the opinion was rendered pre-treatment, Dr. Martin's conclusion that Frain was of borderline intellectual ability was unsupported, and the GAF score of 18 was incorrect on its face.

The first issue is whether the ALJ properly evaluated the checklist of factors required by 20 C.F.R. § 416.927 in deciding that he would not give controlling weight to Dr. Martin's opinion. Dr. Martin examined Frain in July 2011 in connection with her disability application. The parties agree that Dr. Martin is an acceptable medical source, but is not a treating source. (DE 24 at 17, DE 29 at 7). Where there is not a treating doctor, an ALJ should evaluate a checklist of factors in deciding how much weight to give to a medical opinion. 20 C.F.R. § 416.927(C)&(d)(2). Those factors include whether the source examined the claimant, whether the source treated the claimant, how long and/or how often the source treated the claimant, how well-supported the source's opinion is, how consistent the source's opinion is with the rest of the record, whether the source has a specialization relevant to the claimant's claims, and any other factors the parties bring to the ALJ's attention. *Id.* An ALJ is not, however, required to formulaically and explicitly set forth these factors in his opinion – so long as he "minimally articulate[s]" his reasons for ascribing weight to an opinion, he has done enough. *Elder v. Astrue*, 529 F.3d 408, 416 (7th Cir. 2008); *see also Kirby v. Colvin*, No. 1:13-cv-01087, 2014 WL 4908049, at *5 (S.D.Ind. Sept. 30, 2014) ("the ALJ does not have to explicitly discuss and analyze the entire checklist of factors in the opinion").

Here, the ALJ did more than just minimally articulate his reasons for affording no significant weight to Dr. Martin's opinion. After accurately summarizing Dr. Martin's findings, the ALJ found that her opinion was not adequately supported. For example, the ALJ found that Dr. Martin's opinion was not consistent with the rest of the record because it was "not reflective of the claimant's condition during most of the period under consideration" because it was before she was treated. (R. at 28) He further found that Dr. Martin's assessment of a GAF of 18 was not supported as such a low GAF score reflects a functional level that would make it impossible for Frain to have participated adequately in the exam. (*Id*.) He further credited the findings of two state agency psychologists that Dr. Martin's assessment was too extreme to be given any weight. (*Id*.) So although he did not explicitly call out the checklist factors in his opinion, by considering the consistency and support of Dr. Martin's opinion, the ALJ demonstrated that he weighed at least those factors in his determination.

In any event, Frain doesn't demonstrate how evaluating the remaining factors would lend any more weight to Dr. Martin's opinion. Dr. Martin met with Frain only once during a consultative exam. There is no indication that Dr. Martin treated Frain. And although Frain argues that the mere fact that Dr. Martin examined her means Dr. Martin's opinion is entitled to greater weight than the non-examining state agency psychologists (DE 34 at 1), that is only one of many factors to consider. Importantly, supportability and consistency are also factors to weigh (20 C.F.R. § 416.927(c)), and as

discussed in more detail below, the ALJ found that Dr. Martin's opinion wasn't well-supported and did conflict with Frain's other medical records.

Frain disagrees with each of the ALJ's reasons for finding that Dr. Martin's opinion was inconsistent and unsupported. Frain claims the fact that Dr. Martin's opinion was rendered pre-treatment is not a valid reason to reject the opinion because, according to Frain's counselor, even with treatment, Frain could not work. (DE 24 at 16) The Commissioner, however, argues that the counselor's ultimate conclusion was wrong and that Frain's steady improvement would allow her to work. (DE 29 at 9) Both parties agree that Frain made steady improvement, but where the rubber really meets the road here is whether she improved enough to be able to work. The parties focus on Dr. Martin's finding that Frain "is not likely going to prove to be a reliable or good employee until she is better stabilized medically." (R. 27, *citing* Ex. 3F) The ALJ found this is exactly what happened – that after meeting with Dr. Martin and over the course of the succeeding year, Frain began receiving regular treatment at the Bowen Center and "has shown improvement with medications and therapy," is "fairly stable mentally," and has "generally experienced improvement in her condition since starting treatment." (R. 28-30) And while Frain is correct that improvement does not always mean "not disabled" (DE 34 at 7, *citing Scott v. Astrue*, 647 F.3d 734, 739-40 (7th Cir. 2011)), in this case, where the treatment notes show a steady improvement from mostly moderate symptoms to mostly mild symptoms, it means exactly that. This finding was therefore supported by substantial evidence.

Frain accuses the ALJ of "playing doctor" when he discounted Dr. Martin's opinion that Frain was of borderline intellect. (DE 24 at 16) The ALJ essentially found that because Frain had enough mental capacity to complete her GED while in prison, she must not be of borderline intelligence. While I don't know that I'd go so far as to say the ALJ was "playing doctor," I do recognize that he failed to provide any support other than his say-so that obtaining a GED is inconsistent with borderline intellectual functioning, so I can't find that this conclusion was supported by substantial evidence. *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002) (ALJ must build an accurate and logical bridge from evidence to conclusion). This does not, however, meaningfully impact the overall analysis because even omitting this finding, the ALJ's rejection of Dr. Martin's opinion was still supported by the substantial evidence I just identified and will discuss below.

Frain also challenges the ALJ's finding that Dr. Martin's assignment of a GAF of 18 was extreme and incorrect. (DE 24 at 16-17) Frain claims that although a low GAF score is not dispositive for Social Security disability purposes, such a low score could effect the diagnosis, treatment, and prognosis of Frain's alleged mental disorders, and that could impact how long it would take her to become medically stabilized enough to be a good employee. *Id.* But that doesn't address whether the low GAF was warranted in the first place; and in any event, the ALJ found that Frain *was* stabilized medically after treatment. As the ALJ correctly noted, a GAF score of 18 indicates that Frain had some danger of hurting herself or others, or that she would occasionally fail to maintain

minimal personal hygiene, or that she had a gross impairment in communication (*e.g.* largely incoherent or mute). (R. 27) Frain concedes that Dr. Martin's findings on her grooming and communication skills were inconsistent with these indicators, but instead argues that a GAF score of 18 is not inconsistent with Frain being a danger to herself or others, given Frain's suicide attempt in 2004. (DE 34 at 5) Yet Dr. Martin never identified this as the reason for the low GAF score – and indeed, provided no explanation of the score at all – so this is nothing more than conjecture. And looking at the record, there is no support for Frain being a danger to herself or others. Although she attempted suicide in 2004, she stated during her intake at the Bowen Center that she had had no suicidal thoughts or attempts since then – seven years before Dr. Martin's assessment. (R. 544) And Frain points to no evidence otherwise.

Frain additionally claims that the ALJ was "playing doctor" by stating that a GAF score of 18 was inconsistent with the ability to participate in a consultative exam. (DE 34 at 5) Given the characteristics outlined above for a GAF score this low (*e.g.* lack of grooming and being largely incoherent or mute), I find it hard to say that the ALJ was "playing doctor." Instead, it strikes me as common sense that someone with this low of functioning wouldn't be able to meaningfully participate in an exam regarding her mental state. But either way, the ALJ didn't rely on only his common sense, but also relied on the opinion of two state agency psychologists who rejected Dr. Martin's low GAF score. (R. 28) The state agency psychologists found that the GAF of 18 was incorrect because such a low score would indicate symptoms so severe that they

wouldn't go undetected during Frain's two-year incarceration, and that the symptoms would be too severe to mask. *Id*. (And recall, prison intake and treatment notes indicate that Frain was symptom-free while incarcerated.) They further found that it was highly unlikely that she would develop these severe symptoms suddenly upon release from prison. *Id*. These conclusions alone are substantial evidence that the GAF score was inaccurate.

Overall, after evaluating Dr. Martin's opinion, the ALJ properly rejected it as inconsistent with the rest of the record and lacking in adequate support. Dr. Martin saw Frain when she was untreated and said that she wouldn't make a good employee until better stabilized medically – and thankfully that's what happened. Frain received the treatment she needed and improved. Dr. Martin's opinion was therefore properly discounted.

**Jennifer Dyarman, LSW**

Frain also challenges the ALJ's determination not to give any significant weight to the opinion of Frain's therapist and licensed social worker, Jennifer Dyarman. Ms. Dyarman, or another counselor at Bowen, saw Frain approximately every two weeks from August 2011 through at least August 2012. Ms. Dyarman's ultimate conclusion was that despite the improvement Ms. Frain attained in treatment, she was still unable to work and would miss more than four days a month due to her symptom severity. (R. 29)

Under 20 C.F.R. § 416.913(a), the ALJ was correct to find that Ms. Dyarman's opinion could not receive controlling weight because social workers and counselors are not accepted medical sources. Frain does not challenge this finding. What Frain does challenge, however, is the ALJ's finding that under Social Security Ruling 06-3p (outlining the factors used in weighing opinions from "other sources"), her opinion should be afforded no significant weight because it was inconsistent with other evidence in the record and was heavily dependent on Ms. Frain's subjective complaints. (*Id.*)

First, Frain argues that Ms. Dyarman's opinion should be weighed in the same manner as that of a non-examining psychologist because it is counter-signed by Dr. Paula Neuman, Ed.D, Psy.D. Specifically, Frain argues that the ALJ erred by not applying the factors outlined in 20 C.F.R. § 416.927(d), discussed above in connection with Dr. Martin's opinion. Although the ALJ did not explicitly engage in a factor-by-factor analysis (and indeed, was not required to do so (*Elder*, 529 F.3d at 416)), he indicated that he evaluated the opinion under SSR 06-3p, which outlines those same checklist factors. (R. 29) Thus, the ALJ indicated that he applied the proper factors and I have no reason to doubt that occurred. There's no error here.

Frain further claims that Dr. Neuman's counter-signature elevates this opinion to that of an acceptable medical source, rather than an "other source." But Dr. Neuman provided no additional explanation or support for the opinion and indeed, she never examined nor treated Frain. (*See* DE 24 at 18) And Frain provides no explanation or

authority to support giving this opinion more weight solely because Dr. Neuman countersigned it. In fact, the Seventh Circuit and several district courts in this circuit have recently explicitly rejected this very argument in circumstances similar to these. *See Turner v. Astrue*, 390 F.Appx 581, 586 (7th Cir. 2010) (unpublished) (rejecting argument that a physician becomes a treating source simply because a nurse-practitioner filled out a form in collaboration with the supervising physician where there was no evidence that the physician examined the claimant); *Elliot v. Colvin*, No. 1:13-CV-90, 2014 WL 1018053, at *3 (S.D.Ind. Mar. 7, 2014); *Powell v. Colvin*, No. 1:13-CV-51, 2014 WL 1643313, at *11 (N.D.Ind. Apr. 22, 2014); *Cooper v. Astrue*, No. 1:06-CV-1175, 2007 WL 2904069, at *3 (S.D.Ind. Sept. 27, 2007). And even if Dr. Neuman's counter-signature *did* elevate this opinion to an acceptable medical source opinion (and I don't think it does), that fact alone would not outweigh the inconsistencies and lack of support discussed in greater detail below.

Furthermore, despite Frain's argument to the contrary, the fact that Ms. Dyarman regularly met with Frain does not automatically elevate her opinion to carrying greater weight. Indeed, courts in this circuit routinely uphold an ALJ's decision to afford less weight to a counselor's opinion than a consulting psychologist, even where the counselor has met with the claimant more frequently. *See e.g. Wade v. Colvin*, No. 1:12-cv-08260, 2014 WL 349261 (N.D.Ill. Jan 31, 2014) (finding no error in ALJ affording less weight to counselor's opinion that the claimant was disabled where state agency psychologist concluded depression was controlled); *Johnston v. Astrue*, No. 1:09-cv-

00003, 2009 WL 5175211, at *8 (N.D.Ind. Dec. 22, 2009) (finding no error in ALJ affording more weight to state agency psychologist than counselor where opinions conflicted because "the Court does not resolve evidentiary conflicts").

What's more, the fact that Ms. Dyarman met with Frain about every two weeks for almost a year actually highlights the inconsistency in her ultimate opinion because a year's worth of treatment notes indicate Frain was experiencing steady improvement and only mild symptoms, and yet Ms. Dyarman's ultimate conclusion was that she was disabled and could not work. This factor simply doesn't contribute any additional weight to Ms. Dyarman's opinion.

I agree with the ALJ that this inconsistency is significant and provided substantial evidence for affording no weight to Ms. Dyarman's opinion. When Frain first began treatment in September 2011, Ms. Dyarman noted that Frain was in acute distress and that her affect was depressed, but that she appeared relaxed and stable. (R. 641) From October 2011 through December 2011, although she experienced some ups and downs, Frain's overall state improved somewhat to moderate distress, an appropriate (not "depressed") affect, and again, she was relaxed and stable. *(Id.* at 636-40.) Starting in January 2012, Frain improved to mild distress, appropriate affect, and was still relaxed and stable. (*Id.* at 615-28, 649-56, 661-63.) This was when she started on medication. (*Id.* at 628) During this time, the treatment notes indicate Frain was smiling more, was more relaxed, was displaying a greater range of affect, and reported that her medication had helped her. *(Id.*) That's not to say she didn't have some bad

days or that she was totally symptom-free.  Indeed, Frain still reported problems with nightmares, poor sleep, and bedwetting.  (*Id.*)  But overall, the treatment notes during this time reflect steady improvement.

While I agree with Frain that merely reporting that a person is "stable" or has improved does not mean the person is "not disabled" (*Scott v. Astrue*, 647 F.3d 734, 739-40 (7th Cir. 2011)), that's not what happened here.  This isn't a case like *Scott* where the ALJ latched onto a couple of stray comments about a claimant responding well to treatment.  Instead, Ms. Dyarman reported over the course of at least eight months that Frain was consistently experiencing only mild symptoms (and for several months prior to that, only moderate symptoms), and despite a few bad days, steadily improved.  No one is saying that Frain is not depressed or that she doesn't have a hard time some days or that she is, in fact, symptom-free.  I fully recognize that mental illness by its nature tends to wax and wane, with patients having good days and bad.  *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011).  But mental illness is not disabling where it is controlled with medication, even if some symptoms remain.  *Denton v. Atrue*, 596 F.3d 419, 425 (7th Cir. 2010) (depression does not need to be accounted for in RFC where controlled by medication); *Prochaska v. Barnhart*, 454 F.3d 731, 737 (7th Cir. 2006) (same). Ms. Dyarman's treatment notes as a whole reflect that Frain is mostly experiencing only mild symptoms and is stable mentally – that simply isn't consistent with Ms. Dyarman's ultimate conclusion that Frain is disabled and cannot work.  The ALJ was therefore entitled to discount Ms. Dyarman's opinion as internally inconsistent.  *Ketelboeter v.*

*Astrue*, 550 F.3d 620, 625 (7th Cir. 2008) ("if the treating physician's opinion is inconsistent with the consulting physician's opinion, internally inconsistent, or based solely on the patient's subjective complaints, the ALJ may discount it.")

Ms. Dyarman's opinion also wasn't consistent with other evidence in the record. As Frain reported, she was able to engage in a variety activities and present herself as "normal" when necessary. (R. 29) She helped with vacuuming and laundry, cooked, and maintained her hygeine and grooming. (*Id.* at 27.) Although she does not leave the house unless it's necessary, she does leave the house to do occasional shopping and to take walks and ride her bike. (*Id.* at 24.) She also writes in her journal, watches television, draws, crochets, and writes letters to family. (*Id.*) She was also able to relate adequately with the consultative examiner and treating therapists and it does not appear that she missed any appointments. (*Id.* at 29; R. at 615-28, 649-56, 661-63; *see also Punzio*, 630 F.3d at 711 (frequent missed appointments supports opinion regrading projected frequent absenteeism from work).) Plus, she gets along with family members and has social relationships. (R. 24.)

Contrary to Frain's claim, the ALJ was not impermissibly equating Frain's ability to engage in activities of daily living with the ability to work. Instead, the ALJ relied on these reports from Frain and the various examining and non-examining sources to demonstrate the inconsistency of Ms. Dyarman's opinion that Frain was markedly limited in her activities of daily living. (R. 29) And even though he found Ms. Dyarman's opinion to be inconsistent with the record, the ALJ still accommodated a

moderate level of social limitation in Frain's RFC. (R. 30) The ALJ therefore did not place undue weight on Frain's activities of daily living. *Schreiber v. Colvin*, 519 Fed.Appx. 951, 961 (7th Cir. 2013).

Moreover, the ALJ was entitled to discount Ms. Dyarman's opinion because it was based primarily on Frain's own subjective complaints. (*Id.*) This is true even in the mental health context. For example, in *Ziegler v. Astrue*, the Seventh Circuit held that "the ALJ was entitled to give [an examining physician]'s opinion less weight because it was based only on [claimant's] self-reported symptoms" where the claimant alleged debilitating panic attacks. 336 Fed.Appx. 563, 569-70, 2009 WL 2060111, at **6 (7th Cir. 2009). And *Worzalla v. Barnhart* doesn't hold to the contrary. *Worzalla* merely holds that a doctor may rely on a patient's self-reports. *Worzalla v. Barnhart*, 311 F. Supp. 2d 782, 797 (E.D. Wis. 2004). I'm not suggesting otherwise. But while a doctor is entitled to rely on a patient's self-reports, an ALJ is also entitled to discount that doctor's opinion if it relies too much on self-reports. *Ziegler*, 336 Fed.Appx at 569-70. Here, the ALJ found that Ms. Dyarman's opinion relied heavily on Frain's subjective complaints. Indeed, the long list of allegedly objective medical evidence Frain claims Ms. Dyarman relied upon contains primarily subjective complaints reported by Frain. (*See* DE 24 at 19) The ALJ was entitled to discount the opinion for this reason.

In sum, this is not a case where the ALJ "cherry picked" the evidence he relied upon. He fully evaluated Ms. Dyarman's opinion, including the fact that it was countersigned by Dr. Neuman, and ultimately concluded that it lacked consistency and

support and therefore could not be afforded significant weight.  His reasons for doing so were supported by substantial evidence.

**State Agency Psychologists**

Frain contends that the ALJ afforded too much weight and too little scrutiny to the opinions of the state agency psychologists, Drs. Johnson and Clark.  Dr. Johnson reviewed the evidence in July 2011 and Dr. Clark affirmed Dr. Johnson's opinion in October 2011.  (R. 28) The ALJ credited their findings and afforded them the most weight because he believed that they provided "a persuasive explanation of the reasons for discounting the claimant's allegations, *i.e.* the inconsistencies in the record regarding her activities and mental health history." (R. at 30)  Specifically, Dr. Johnson found that Frain's claims regarding the severity of her symptoms, and Dr. Martin's likewise extreme assessment of her condition, were not credible because if her condition was really that severe, she would have been unable to mask the symptoms during her incarceration.  (*Id*. at 28.)  Instead, Frain displayed no symptoms during her regular contact with medical professionals while in prison.  The state agency psychologists also concluded that "a sudden onset of such symptoms following her release from prison is highly unlikely." (*Id*.)

Frain claims that the ALJ should have weighed Ms. Dyarman's opinion more heavily than those of the state agency psychologists.  Essentially, Frain argues that the ALJ should have accepted the opinion of the individual who treated Frain the longest and most frequently, as opposed to some state agency psychologists who never met

Frain. This argument has some initial appeal. Yet as discussed in more detail above, Ms. Dyarman's opinion simply wasn't consistent with her own treatment notes or the other evidence in the record, nor was it adequately supported. And weighing conflicts between opinions is the ALJ's job, not mine. *Young*, 362 F.3d at 1001-02. Indeed, "State agency medical and psychological consultants . . . are highly qualified physicians and psychologists who are also experts in Social Security disability evaluation." 20 C.F.R. § 404.1527(f)(2)(I). The ALJ was entitled to resolve the conflict by placing more weight on the medical opinions of the state agency psychologists than on the inconsistent, unsupported opinion of a non-medical source.

Frain also claims that I should reject the state agency opinions because Dr. Johnson stated that Frain could still do "unskilled work." Frain is correct that according to the Social Security Program Operations Manual System (POMS)[4], a state agency psychologist is not supposed to offer an opinion as to whether the claimant is disabled or can perform a certain level of work. *See* POMS DI 24510.065B.1.D. But nowhere does it say that any such opinion must be outright rejected. And the cases I have found addressing the issue have held the contrary. *Milliken v. Astrue*, 397 F. Appx. 218, 221-22

---

[4] "The POMS is a primary source of information used by Social Security employees to process claims for Social Security benefits." SSA's Policy Information Site, https://secure.ssa.gov/apps10/ (last visited Nov. 25, 2014). Social Security Ruling 13-2p requires an ALJ to follow POMS. SSR 13-2p ("We require adjudicators at all levels of administrative review to follow agency policy, as set out in the Commissioner's regulations, SSRs, Social Security Acquiescence Rulings (ARs), and other instructions, such as the Program Operations Manual System (POMS) . . . .").

(7th Cir. 2010); *Kraus v. Colvin*, No. 13-C-0578, 2014 WL 1689717, *4 (E.D. Wis. Apr. 29, 2014).

**Credibility**

Although credibility determinations are frequently at the center of social security appeals, Frain's arguments here are curiously underdeveloped and appear to be almost an after-thought. Frain argues that the ALJ erred in finding that her claims of symptom severity were undermined by her lack of symptoms while in prison. She points to the fact that her subsequent evaluations at the Bowen Center confirm that she was, indeed, depressed. Again, no one is disputing that Frain suffered from some degree of depression. But what is in dispute is whether she is *disabled*. The ALJ found that the severity of symptoms Frain claimed wasn't credible because, as the state agency psychologists found, she would not have been able to mask such severe symptoms while in prison and a sudden onset after her release was highly unlikely. (R. at 28) Frain has not shown that this result is "patently wrong" and therefore it will not be disturbed. *Pepper v. Colvin*, 712 F.3d 351, 356 (7th Cir. 2013).

Frain's last argument is that the ALJ could not make a proper credibility determination until he properly evaluated the medical evidence on remand. Since I have found that the ALJ already properly evaluated the medical evidence and that remand is unnecessary, this argument is moot.

# CONCLUSION

I cannot find the ALJ committed error here. In weighing the evidence, he was confronted with an extreme, unsupported opinion by a consulting doctor and a recommendation by a non-medical counselor that was inconsistent with her own treatment notes. Two highly qualified state agency psychologists provided compelling reasons for discounting both of these opinions, along with discounting Frain's credibility. In deciding to afford the greatest weight to these latter opinions, the ALJ presented a thorough and detailed opinion explaining how he arrived at this conclusion. His decision was supported by substantial evidence and his credibility finding was not patently wrong. His decision therefore will not be disturbed.

For the forgoing reasons, the decision of the Commissioner is **AFFIRMED**. The Clerk is directed to enter a judgment in favor of the Commissioner and against Frain.


**SO ORDERED**.

ENTERED: November 26, 2014

s/Philip P. Simon
PHILIP P. SIMON, CHIEF JUDGE
UNITED STATES DISTRICT COURT
